UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MANUELA FARINAS,<br><br>                                        Plaintiff,<br><br>v.<br><br>ANDREW SAUL, Commissioner of<br>Social Security,<br><br>                                        Defendant. | Case No.:  19-CV-1760-GPC-WVG<br><br>**REPORT AND**<br>**RECOMMENDATION ON CROSS-**<br>**MOTIONS FOR SUMMARY**<br>**JUDGMENT** |

On November 15, 2013, Manuela Farinas ("Plaintiff") filed her initial application for Social Security Disability Insurance under Title II of the Social Security Act ("Title II" or "Act"). (AR 21; 158.) On March 19, 2014, Plaintiff renewed her request for Title II benefits after Andrew Saul, Commissioner of Social Security, ("Defendant" or "Commissioner") denied Plaintiff's initial application. (AR 158; 186.) Defendant again denied Plaintiff's application on June 19, 2014. (AR 190.) Plaintiff sought further administrative relief by appealing Defendant's decision to the Appeals Council. (AR 175; 253.) On July 15, 2019, after a series of administrative proceedings, the Appeals Council finalized the Administrative Law Judge's ("ALJ") decision that Plaintiff was not disabled under Title II. (AR 1-8.) By doing so, the Appeals Council denied Plaintiff Title II benefits.

(*Id.*) This litigation followed. Before this Court are Plaintiff and Defendant's ("Parties") cross-motions for summary judgment. For the reasons below, the Court RECOMMENDS that Plaintiff's summary judgment motion be DENIED and Defendant's summary judgment motion be GRANTED.

## I.    PROCEDURAL HISTORY

On November 15, 2013, Plaintiff protectively filed her initial application for disability benefits under Title II of the Social Security Act[1]. (AR 21; 158.) In doing so, Plaintiff identified June 15, 2011 as the onset of her disabling condition, which she described as lower back problems and an injury to her left knee. (*Id.*) Plaintiff reported in her application that, since June 15, 2011, she had not worked as a result of her disabling condition. (AR 101.) On March 19, 2014, Defendant denied Plaintiff's application for Title II benefits based on a finding of non-disability. (*Id.*; AR 158.)

On March 24, 2014, Plaintiff requested reconsideration for Title II benefits. (AR 186.) On June 19, 2014, Defendant affirmed its March 19, 2014 decision denying Title II benefits. (AR 190.) On July 7, 2014, Plaintiff requested a hearing before an ALJ; Defendant granted Plaintiff's request on July 21, 2014. (AR 192-198.) On May 24, 2016, Administrative Law Judge Eric V. Benham ("ALJ") convened a hearing on Plaintiff's matter. (AR 212-217.) On September 19, 2016, the ALJ issued his Notice of Decision and found Plaintiff was not disabled within the meaning of Title II. (AR 158-168.) Consistent with the ALJ's Notice of Decision, Defendant again denied Plaintiff's application.

On November 11, 2016, Plaintiff appealed the ALJ's decision and sought administrative relief from the Appeals Council. (AR 175; 253.) On July 31, 2017, the Appeals Council vacated the ALJ's decision and remanded Plaintiff's case to the ALJ for resolution of three specific issues:

---

[1] Prior to the proceedings referenced throughout this Report and Recommendation, Plaintiff filed an earlier application for Title II benefits on June 19, 2012. (AR 158.) The Commissioner denied that application on October 31, 2012. (*Id.*) Plaintiff did not file a request for reconsideration. (*Id.*) These earlier proceedings in 2012 do not inform the Court's recommendations herein as they are not at issue.

(1) "The hearing decision indicates that the claimant has severe mental impairments but does not contain rationale for B and C criteria rated using the special technique described in 20 CFR 404.1520(a);"

(2) "The residual functional capacity should address the claimant's maximum ability to perform work related activities such as her ability to perform simple, detailed, and complex tasks (Social Security Rule 96-8p);" and

(3) "On April 26, 2016, approximately a month prior to the hearing, 736 pages [of] medical records document [were] submitted into the F section of the electronic file. The Administrative Law Judge did not enter this evidence into the record, consider it, or label it as duplicative." (AR 174-176.)

On remand, the ALJ convened a hearing on Plaintiff's case on March 29, 2018. (AR 21; 42-70.) On September 5, 2018, the ALJ issued his second and final Notice of Decision. As before, the ALJ found Plaintiff was not disabled within the meaning of Title II after having reviewed the entirety of the record, inclusive of the medical records newly admitted on remand. (AR 21-34.) On July 15, 2019, the Appeals Council denied Plaintiff further review, noting "the reasons (Plaintiff cited in her appeal) do not provide a basis for changing the Administrative Law Judge's Decision." (AR 1-8). By so finding, the Appeals Council confirmed the ALJ's determination of non-disability and denied Plaintiff Title II benefits.

On September 13, 2019, Plaintiff initiated this litigation. (Doc. No. 1.) Pursuant to 42 U.S. section 405(g), Plaintiff seeks judicial review of Defendant's denial of Title II benefits. (*Id*.) On October 11, 2019, Plaintiff filed a First Amended Complaint ("FAC"), which serves as the operative complaint in this matter. (Doc. No. 6.) On December 20, 2019, this Court issued an Order Setting Briefing Schedule on Cross-Summary Judgment Motions. (Doc. No. 14.) On February 20, 2020, Plaintiff timely filed her summary judgment motion. (Doc. No. 18.) On April 16, 2020, Defendant timely filed its cross-summary judgment motion. (Doc. No. 19.) On May 19, 2020, Plaintiff replied to Defendant's cross-summary judgment motion. (Doc. No. 20.) The Parties' cross-summary

judgment motions are ripe for this Court's review and recommendation to Judge Curiel.

## II.   FACTUAL BACKGROUND

### a.  Plaintiff's Medical Condition

Plaintiff was born on March 10, 1963. (AR 1784). In or around 2000, Plaintiff worked as a caregiver with In-Home Support Services ("IHSS"). (AR 1785). Her job duties centered on providing patient care, which encompassed bathing, dressing, and cooking for and feeding patients, as well as housekeeping and cleaning. (*Id*.) Plaintiff's position as a caregiver necessarily involved physical activity, namely "sitting, standing, walking, bending, twisting, reaching, pushing, pulling, lifting up to 100 pounds, squatting, kneeling, climbing, crawling, overhead work, keyboarding, grasping, and torqueing." (*Id*.)

Throughout her years as a caregiver, Plaintiff experienced a series of injuries, most, but not all, of which were job-related. First, Plaintiff was rear-ended in a car accident in 2007. (AR 1791.) Consequently, Plaintiff sustained a neck injury and underwent a course of physical therapy for treatment. Her symptoms fully resolved.  (*Id*.) Since then, Plaintiff's injuries arose in the course of her employment with IHSS. In 2009, Plaintiff reported experiencing pain in both of her wrists as a result of carrying groceries for her patients. (AR 1791.) In 2010, Plaintiff reported slipping and falling at work, which caused Plaintiff lower back pain. (*Id*.) After seeking and receiving treatment, Plaintiff's back issues resolved within two weeks. (*Id*.)

Most seriously, on or around January 4, 2011, Plaintiff suffered a workplace injury while attempting to dress an elderly patient who weighed approximately 180 pounds. (AR 1791.) As a result of her injury, Plaintiff reported "experiencing pain within both of her shoulders, knees, and hips as well as within her low back and head." (*Id*.) Plaintiff's injury prompted her to seek treatment from Dr. Romero, who had been treating Plaintiff in his capacity as a pain specialist since September 2009. (AR 1204; 1935.) Plaintiff has not returned to work to any extent since June 15, 2011. (AR 1786.)

/ / /

/ / /

4

### b. Dr.'s Romero's Medical Examination and Treatment of Plaintiff

Over the years, Dr. Romero treated Plaintiff for numerous physical conditions relating to bilateral arm pain, bilateral leg pain, right shoulder and back pain, and right rotator cuff repair, as well as mental conditions, namely depression and generalized anxiety, the findings of which were central to the ALJ's September 5, 2018 Notice of Decision[2]. (AR 103.)

Between April 2013 through February 2016, Dr. Romero reported Plaintiff was responding well to prescribed medication for pain management and observed that Plaintiff's condition continued to improve. (AR 759; 801; 1125; 1235; 1261; 1747; 1750.) Further, Dr. Romero conducted ongoing physical examinations in response to Plaintiff's lower back and bilateral knee pain stemming from her 2011 workplace injury. Dr. Romero's notes on these physical examinations were largely unremarkable in documenting "mild to moderate tenderness," "negative SLR [straight leg raising test]," and "normal strength and gait." (AR 584-585; 609-610; 714-715; 720; 730; 736-737; 741-742; 746-747; 1112; 1117; 1127; 1133; 1144.)

Additionally, Dr. Romero assessed the state of Plaintiff's mental health on an ongoing basis. Dr. Romero's progress notes reflected "[Plaintiff] has no difficulty focusing on a subject" (AR 25), "no complaints of dizziness or vertigo" and a normal CT scan of Plaintiff's head in August 2015 (*Id.*), Plaintiff's ability to "attend to and follow commands normally and with intact memory" (AR 26), "no difficulty focusing on a subject" (*Id.*), Plaintiff "was exercising by walking half a mile to one mile three times a week" (AR 31), and that, despite Plaintiff's disabling condition, which including depression and anxiety, Plaintiff "[took] a number of trips, primarily to Mexico that involve[d] taking the bus which [could] last up to 9 hours… [and] she was even able to make the international trip to the

---

[2] Various other state agency and independent physicians evaluated and treated Plaintiff for purposes of the relevant proceedings. Those physicians and medical experts' opinions, notes, and records are referenced in Section IV: Discussion of this Report and Recommendation, where appropriate.

Philippines where she stayed for 3 months." (AR 29-30.)

In April 2016, Dr. Romero concluded Plaintiff was limited in her ability to work due to lower back and leg pain. (AR 1204-1205.) Specifically, Dr. Romero found Plaintiff:

(1) would be off work 25 percent of the time due to trouble concentrating;

(2) would miss more than four days of work per month;

(3) could occasionally lift no more than 20 pounds or else worsen Plaintiff's lower back pain;

(4) could sit four hours per day and stand or walk three hours per day;

(5) required a sit/stand option at work;

(6) could frequently reach in all directions;

(7) could occasionally push and pull with the bilateral upper extremities;

(8) occasionally climb ramps and stairs but never climb ladders and scaffolds;

(9) rarely balance, stoop, kneel, crouch;

(10)   never crawl;

(11)   occasionally operate a motor vehicle;

(12)   occasionally be exposed to extreme temperatures;

(13)   and never be exposed to unprotected heights, pulmonary irritants, and vibrations. (AR 1204-1207.)

### c.  The ALJ's September 5, 2018 Notice of Decision

As noted, on September 5, 2018, the ALJ issued his Notice of Decision. The ALJ set forth the following key findings that ultimately informed his conclusion that Plaintiff was not disabled within the meaning of Title II[3]:

(1) "The claimant last met the insured status requirements of the Social Security Act on December 31, 2016" (AR 24);

(2) "The claimant did not engage in substantial gainful activity during the period from

---

[3] The Court cites directly to all relevant portions of the ALJ's September 5, 2018 Notice of Decision to avoid any confusion or misinterpretation of the ALJ's findings on Plaintiff's disability status.

her alleged onset date of June 15, 2011 through her date last insured of December 31, 2016 (20 CFR 404.1571, et seq.)" (*Id*.);

(3) "Through the date last insured, the claimant had the following severe impairments: degenerative disc disease of the lumbar spine; status post bilateral shoulder surgeries with residual bilateral shoulder pain; major depressive disorder; and post-traumatic stress disorder (PTSD) (20 CFR 404.1520(c))" (*Id*.);

    a. In so finding, the ALJ cited to the evidentiary record as follows:

- "Examinations show normal range of motion of the hips with no neurological deficits" (AR 24);

- "No severe hip impairment is established" (*Id*.);

- "Neurologist Edward Friedman, M.D., who evaluated the claimant in May 2014 did not [find] evidence of any neurological disorder and opined that there was no evidence to warrant further neurological testing. No severe neurological impairment is established in connection with these complaints" (*Id*.);

- "MRI scans of the cervical spine in August 2012 and April 2014 were completely normal. CT scan of the cervical spine in August 2015 was normal. Examinations of the cervical spine have been mostly normal other than some reduced range of motion with tenderness and paraspinal muscle spasms on rare occasions" (AR 25);

- "MRI scan of the left knee in May 2012 was normal. X-ray of the left knee in November 2012 was negative. MRI of the left knee in September 2012 was only remarkable for chrondromalacia of the medical margin of the patella. MRI of the right knee in May 2012 was normal. Examinations of the knees reveal full range of motion of the knees. No severe knee impairment is established by the record" (*Id*.);

- "EMG/NCV testing in July 2012 was normal with no evidence of carpal tunnel syndrome. Further, the claimant has been consistently

neurologically intact. This is not a severe impairment" (*Id.*);

- "MRI scan of the left elbow in September 2012 showed mild distal triceps tendinopathy" (*Id.*);

- "Attending physician Romero documented no complaints of dizziness or vertigo. CT scan of [Plaintiff's] head in August 2015 was normal. Neurologist Edward Friedman, M.D., who evaluated the claimant in May 2014, did not find evidence of any neurological disorder and opined that there was no evidence to warrant further neurological testing. No severe neurological impairment is established in connection with the complaints of vertigo and dizziness" (*Id.*);

- "There is no evidence of continued alcohol abuse. Therefore, her history of alcohol abuse, in reported full remission, is not a severe impairment" (*Id.*); and, finally,

- "There are no records that indicate that the claimant's asthma had been a significant problem requiring ongoing or regular treatment. Examinations of her lungs have been normal. Her asthma is not a severe impairment." (*Id.*)

(4) "Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments on 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526)" (AR 26);

   a. In so finding, the ALJ cited to the evidentiary record as follows:

- "In understanding, remembering, or applying information, the claimant had a mild limitation. Progress notes from attending physician Romero show that the claimant is able to attend to and follow commands normally and with intact memory. Mental status examinations from PsyCare and Dr. Chavez show that the clamant has been mostly cognitively intact since he began treating the claimant in 2011, except for some visits in which he noted poor

memory. This limitation is consistent with the opinion of Dr. Nicholson" (AR 26);

- "In interacting with others, the claimant had a mild limitation. This limitation is consistent with the opinion of Dr. Nicholson, [another physician who examined Plaintiff]. The record shows that even with the claimant's physical and mental impairments, she has a fairly good support network consisting of her immediate relative(s) and friends" (*Id.*);

- "With regard to concentrating, persisting, or maintaining pace, the claimant had a moderate limitation. Progress notes from Dr. Romero show that the claimant has no difficulty focusing on a subject. Mental status examinations from PsyCare and Dr. Chavez show that claimant has been mostly cognitively intact since he began treating claimant in 2011, except for some visits in which he noted poor concentration. While Dr. Nicholson opined that the claimant has a mild limitation in this domain, I have given the claimant the benefit of the doubt and found a moderate limitation is indicated when considering the combined effects of her depression, anxiety, and chronic pain" (*Id.*); and, finally,

- "As for adapting or managing oneself, the claimant had experienced a moderate limitation (one inpatient psychiatric hospitalization in July 2014. However, mental health treatment records show that the claimant's symptoms have stabilized with treatment; there is no evidence of suicidal ideation, suicide attempts, panic attacks, agoraphobia, or other exacerbations. She has been able to live normally and even take a number of trips, primarily to Mexico that can require up to a 9 hour bus ride… She even had a 3 month stay in the Philippines. (AR 27.) Because the claimant's mental impairments did not cause at least two "market" limitations or one "extreme limitation, the paragraph B criteria were not satisfied." (*Id.*)

(5) "After careful consideration of the entire record, the undersigned finds that, through

the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except for occasional bending, stooping, crouching, climbing stairs, kneeling; no crawling or climbing ladders; and due to her depression and anxiety, she is limited to no complex or highly detailed work but can do simple or mildly detailed work" (AR 27);

    a.  In so finding, the ALJ cited to the evidentiary record as follows:

- "In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSR 16-3p. The undersigned has also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527." (AR 27.)

(6) "Through the date last insured, the claimant was unable to perform any of her past relevant work (20 CFR 404.1565) (AR 32.) …I accept the testimony of the vocational expert and so find" (AR 32);

(7) "The claimant was born on March 10, 1963 and was 53 years old, which is defined as a young individual age 18-49, on the date last insured. The claimant subsequently changed age category to closely approaching advance age (20 CFR 404.1563)" (*Id.*);

(8) "The claimant has a marginal education and is able to communicate in English" (*Id.*);

(9) "Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is 'not disabled,' whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2)" (*Id.*);

(10)    "Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)" (*Id.*); and

(11)    "The claimant was not under a disability, as defined in the Social Security

Act, at any time from June 15, 2011, the alleged onset date, through December 31, 2016, the date last insured (20 CFR 404.1520(g))" (AR 33).

Taking these findings together, the ALJ determined Plaintiff's residual functional capacity ("RFC") was restricted by certain exertional limitations, specifically: (1) occasionally lifting and/or carrying up to 20 pounds; (2) frequently lifting and/or carrying up to 10 pounds; (3) standing and/or walking with normal breaks for approximately six hours in an eight-hour workday; (4) occasionally climbing ramps and/or stairs; (5) never climbing ladders, ropes, and/or scaffolds; and (6) occasionally stopping, kneeling, crouching, and crawling. (AR 106-7.) In light of these limitations, the ALJ concluded, "considering [Plaintiff's] age, education, work experience, and residual functional capacity, the claimant was capable of making a successful adjustment to other work that existed in significant numbers in the national economy." (*Id*.) Accordingly, the ALJ held "Plaintiff was not disabled under sections 216(i) and 223(d) of the Social Security Act through December 31, 2016, the date last insured." (AR 33.)

### III.   LEGAL STANDARD

#### a.   Title II Analysis

Under Title II of the Social Security Act, an applicant merits Social Security Disability Insurance if (1) she suffers from a medically determinable impairment that has endured or can be expected to endure for at least twelve consecutive months or is reasonably likely to result in death; and (2) as a result of her impairment, she cannot perform the work that she previously performed or *any other gainful work* within the national economy. 42 U.S.C. § 423(d)(2)(A) (emphasis added). At all times, the applicant bears the burden of establishing her disability and entitlement to benefits. *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 689 (9th Cir. 2007); *Rhinehart v. Finch*, 438 F.2d 920, 921 (9th Cir. 1971). Where the applicant makes such showing, the burden shifts to the Commissioner to prove the applicant is still able to work and there is work available for her. *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007); *Kail v. Heckler*, 722 F.2d 1496, 1498 (9th Cir. 1984).

To evaluate whether an applicant is qualified under the Act, the court undertakes a five-step inquiry, namely whether (1) the applicant is presently working in a substantially gainful activity; (2) the subject impairment is severe; (3) the impairment "meets or equals" one of the list of impairments itemized in the Social Security Regulations; (4) the applicant is able to perform any work that she has not previously performed; and (5) the applicant is able to perform any other work, where, if so, the Commissioner bears the burden of proving "that there are a significant number of jobs in the national economy that the [applicant] can do." 20 C.F.R. § 404.1520 (1999). Importantly, the court's inquiry ends where an applicant is found to be "disabled" or "not disabled" at any step in the analysis. *Id*.

### b. Judicial Review of Administrative Decisions on Title II Applications

Section 405(g) of the Act allows unsuccessful applicants to seek judicial review of the Commissioner's final administrative decisions. 42 U.S.C. § 405(g). The scope of judicial review is limited. The Commissioner's denial of benefits "will be disturbed only if it is not supported by substantial evidence or is based on legal error." *Brawner v. Sec'y of Health and Human Servs.*, 830 F.2d 432, 433 (9th Cir. 1988); *see also Sandgather v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997) (substantial evidence is "more than a mere scintilla" but less than a preponderance).

At all times, the court must consider the record in its totality, weighing evidence that both supports and weakens the Commissioner's conclusions. *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988). Where an Administrative Law Judge ("ALJ") fails to apply the proper legal standards in reaching his decision, the court must set aside the ALJ's decision. *Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005). On the other hand, where the evidence supports more than one rational interpretation, the court must uphold the ALJ's decision. *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984). Under such circumstances, the court's deference to the ALJ's decision is compulsory. *Bayliss*, 427 F.3d at 1214 n.1; *Sandqathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997).

/ / /

/ / /

# IV.   DISCUSSION

## a.  The ALJ Properly Assessed Opinion Evidence

Plaintiff's summary judgment motion is largely premised upon the contention that the ALJ improperly weighed medical opinion evidence from Plaintiff's treating physician, Dr. Romero, in finding Plaintiff not disabled under Title II. (Doc. No. 18, 6-21.) In particular, Plaintiff charges the ALJ with "substituting his own lay opinion for that of the medical provider" by "reject[ing]… a medical provider's opinion as inconsistent with their own treatment notes." (Doc. No. 18, 15:5-8.) Plaintiff also argues the ALJ wrongly discounted Plaintiff's examining physician, Dr. Sidney Levine's ("Dr. Levine"), medical opinion that Plaintiff was "disabled from carrying out her regular work activities" for purposes of Plaintiff's then-pending Worker's Compensation claim. (AR 1796.) The Court examines these two assertions in turn and finds neither persuasive.

### i.  Dr. Romero's Medical Opinion

As a threshold matter, an ALJ is authorized to assess the credibility of medical opinions in the record and assign weight to those opinions accordingly. 20 C.F.R. § 404.1527. In doing so, the ALJ must be able to articulate the basis for assigning more or less weight to the relevant medical opinions. 20 C.F.R. § 404.1527(c); *Batson v. Comm'r of Soc. Sec.*, 359 F.3d 1190, 1197 (9th Cir. 2004). Contrary to what Plaintiff suggests, an ALJ is not obligated to assign more weight to a medical opinion solely because that the opinion was provided by a litigant's treating physician. Rather, a medical opinion earns its weight in proportion to the evidence and its consistency with "the record as a whole." 20 C.F.R. § 404.1527(c)(4); *Valentine v. Astrue*, 574 F.3d 685, 692-93 (9th Cir. 2009); *Bray v. Astrue*, 554 F.3d 1219, 1228 (9th Cir. 2009).

Plaintiff cites a single case, *Miller v. Astrue*, in support of her proposition that the ALJ improperly substituted his judgment for that of Dr. Romero's regarding Plaintiff's medical condition. The pin cite Plaintiff submits to the Court states that an ALJ is "not at liberty to ignore medical evidence or substitute his own views for uncontroverted medical opinion." *Miller v. Astrue*, 695 F.Supp.2d 1042, 1048 (C.D. Cal., Jan. 28, 2010) (citing

*Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir.1999); *Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir.1975); *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir.1998); *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir.1996); *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir.1985)). As a foundational matter, the *Miller* pin cite sets forth well-established law, and when applied to the facts of this case, is rather inconsequential. To that end, the facts of *Miller* starkly contrast the record here and does not support Plaintiff's position regarding the ALJ's treatment of Dr. Romero's medical opinion. Nevertheless, Plaintiff opted to mischaracterize *Miller* to suggest the ALJ was not entitled to accounting for obvious inconsistencies throughout Dr. Romero's records in the ALJ's Notice of Decision. Plaintiff's misleading citation to *Miller* is not well taken and makes apparent that Plaintiff lacks legal authority to support her position, especially given that *Miller* is Plaintiff's sole legal support.

Moreover, Plaintiff fails to show any factual basis that the ALJ substituted his own conceptions about Plaintiff's medical condition for Dr. Romero's medical opinion. Plaintiff also does not present evidence the ALJ ignored Dr. Romero's medical records to any extent. Having reviewed the more than 2,500 pages of the administrative record, the Court finds no such evidence exists. In fact, the ALJ's Notice of Decision is supported by citations to Dr. Romero's medical opinion, the evidentiary record, and the inconsistencies between the two. Plaintiff attempts to skirt this uncomfortable truth by suggesting the inconsistencies within Dr. Romero's medical opinions arise from Plaintiff's "self-description of her impairments and limitations," which Dr. Romero noted during Plaintiff's medical appointments. (Doc. No. 18, 12:1-8.) Not so.

Discrepancies plainly exist between Dr. Romero's opinions and the evidentiary record itself, which includes the results of examinations Dr. Romero conducted on Plaintiff and Dr. Romero's notes on Plaintiff's medical condition. As noted, since 2009, Dr. Romero treated Plaintiff for numerous physical conditions relating to bilateral arm pain; bilateral leg pain; right shoulder and back pain; and right rotator cuff repair, as well as mental conditions, namely depression and generalized anxiety. (AR 103; 1204; 1935.) Throughout

his evaluation and treatment of Plaintiff, Dr. Romero conducted numerous physical and mental examinations of Plaintiff's medical condition, the findings of which are, at times, at odds with Dr. Romero's conclusions about Plaintiff's disability status. To refresh, in April 2016, Dr. Romero concluded Plaintiff was limited in her ability to work due to lower back and leg pain. (AR 1204-1205.) As aforementioned, Dr. Romero found Plaintiff:

    (1) would be off work 2 percent of the time due to trouble concentrating;

    (2) would miss more than four days of work per month;

    (3) could occasionally lift no more than 20 pounds or else worsen Plaintiff's lower back pain;

    (4) could sit four hours per day and stand or walk three hours per day;

    (5) required a sit/stand option at work;

    (6) could frequently reach in all directions;

    (7) could occasionally push and pull with the bilateral upper extremities;

    (8) occasionally climb ramps and stairs but never climb ladders and scaffolds;

    (9) rarely balance, stoop, kneel, crouch;

    (10)   never crawl;

    (11)   occasionally operate a motor vehicle;

    (12)   occasionally be exposed to extreme temperatures;

    (13)   and never be exposed to unprotected heights, pulmonary irritants, and vibrations. (AR 1204-1207.)

Having considered Dr. Romero's findings, the ALJ ultimately assigned marginal weight to Dr. Romero's opinion because it conflicted with Dr. Romero's own notes, Plaintiff's examination results, evidence of Plaintiff's rehabilitation and effective treatment, Plaintiff's own admissions regarding her physical and mental abilities, and the opinions of agency physicians. (AR 30-31.) To that end, and rather notably, the ALJ observed "the claimant has not generally received the type of medical treatment one would expect for a totally disabled individual." (AR 29.)

As to Plaintiff's physical health, the ALJ observed Dr. Romero's notes, Plaintiff's

examination results under his care, and Plaintiff's own admissions undermined Dr. Romero's finding of Plaintiff's disabling condition. Between April 2013 through February 2016, Dr. Romero reported Plaintiff was responding well to prescribed medication for pain management and observed Plaintiff's condition continued to improve. (AR 759; 801; 1125; 1235; 1261; 1747; 1750.) Further, Dr. Romero conducted ongoing physical examinations in response to Plaintiff's alleged lower back and bilateral knee pain stemming from 2012 and the results of those examinations did not support Dr. Romero's ultimate conclusions on Plaintiff's disability status. Specifically, between February 2012 and October 2014, Plaintiff's examination results were largely unremarkable and repeatedly comprised of Dr. Romero's notes of "mild to moderate tenderness," "negative SLR [straight leg raising test]," and "normal strength and gait." (AR 584-585; 609-610; 714-715; 720; 730; 736-737; 741-742; 746-747; 1112; 1117; 1127; 1133; 1144.)

Equally important, Plaintiff admitted to frequently traveling to Mexico, which involved sitting through a nine-hour bus ride, and travelling internationally to the Philippines for a period of three months. Dr. Romero acknowledged so in his notes. Further, Dr. Romero also documented that Plaintiff "was exercising by walking half a mile to one mile three times a week." (AR 31.) Taken together, Plaintiff's cross-border and international travels and ability to exercise multiple times on a weekly basis belied Dr. Romero's position that Plaintiff would be substantially limited in her range of motion and physical stamina in a functional capacity at work. (AR 30-31.) It was, therefore, reasonable for the ALJ to discount Dr. Romero's assessment of Plaintiff's physical health when viewed in totality of the evidentiary record.

As to Plaintiff's mental health, the ALJ noted "mental health treatment records show that claimant's symptoms have stabilized with *conservative* mental health treatment." (AR 29.) The ALJ highlighted a lack of evidence of weight loss, sleep deprivation, and cognitive deficits "due to pain or depression." (AR 30.) As noted immediately above, Dr. Romero's own notes indicate that, despite her reportedly disabling condition, Plaintiff "has been able to take a number of trips, primarily to Mexico that involve taking the bus which can last

up to 9 hours... she was even able to make the international trip to the Philippines where she stayed for 3 months." (AR 29-30.) Plaintiff's general mental wellness was underscored by other medical consultants, including state agency doctors and attending psychiatrist Dr. Mario Chavez, who observed Plaintiff was "doing okay" and that she "had no problems," which was affirmed in a progress note on June 15, 2015." (*Id*.) Further, the ALJ observed "the objective medical evidence shows that the medications have been relatively effective in controlling the claimant's symptoms... Moreover, the claimant has not alleged any side effects from the use of medications..." (*Id*.) With these circumstances in mind, the Court finds no basis to conclude the ALJ acted improperly when he declined to place more weight on Dr. Romero's medical opinion. In view of the record the ALJ cited in his Notice of Decision, the evidence suggests Plaintiff was objectively better off than Dr. Romero concluded in April 2016 and not limited to the severe extent Dr. Romero represented.

Based on the above, the ALJ concluded, "the record does not show that the claimant requires any special accommodations to relieve her pain or other symptoms... In contrast to the allegations of claimant's disabling pain and limitation, she does not exhibit any significant atrophy, loss of strength, or difficulty moving that are indicative of severe and disabling pain.... There is no evidence of weight loss... there is no evidence of sleep deprivation... there is no evidence of cognitive deficits... Consequently, taking into account the claimant's statements concerning the intensity, persistence, and limiting effective of her symptoms, the record does not support a more restrictive residual functional capacity than that found above for the period prior to the date last insured." (AR 29-30.) The Court strains to find impropriety in ALJ's decision to assign less weight to Dr. Romero's medical opinion, considering the evidentiary record controverts Dr. Romero's broad conclusions of Plaintiff's disability status.

### ii.  Dr. Levine's Vocational Statement

Plaintiff also argues the ALJ's Notice of Decision did not sufficiently account for Dr. Levine's March 12, 2012 statement that "Plaintiff was disabled from carrying out her regular work activities." (AR 1796.) Plaintiff adds that Dr. Levine testified "an individual

who requires even one extra unscheduled break, and/or would be absent three days per months, is unable to maintain competitive employment." (AR 65.) From this solitary excerpt, Plaintiff concludes she sufficiently demonstrated her total disability to the ALJ, when taken together with Dr. Romero's medical opinion described above. (AR 65.) Plaintiff errs in doing so. "Opinions on some issues… are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case." 20 C.F.R. § 404.1527(d). Specifically, the Code of Federal Regulations on employee disability benefits reserves "opinions that you are disabled" exclusively for the Commissioner's determination. 20 C.F.R. § 404.1527(d)(1). Importantly, and for this very reason, the Commissioner "will not give any special significance to the source of an opinion on issues reserved to the Commissioner described in paragraphs (d)(1) and (d)(2) of this section." 20 C.F.R. § 404.1527(d)(3).

As a foundational matter, Dr. Levine's statement regarding Plaintiff's inability to carry out her "regular work activities" does not *de facto* make Plaintiff totally or partially disabled such that Plaintiff may be precluded from maintaining *any* employment available in the national economy. *See generally* 20 C.F.R. § 404.1520. As Defendant points out, taking his statement in the context of the entirety of his March 12, 2012 report, Dr. Levine noted Plaintiff was specifically limited in one aspect of her prior work as a caregiver, namely lifting 100 or more pounds at a time. Beyond this observation, Dr. Levine's March 12, 2012 report summarizes overall unremarkable physical examination results, including, but not limited to, "slight narrowing of the L5-S1 intervertebral disc space, [where] the remaining disc spaces are adequately maintained," "no evidence of fracture or bony abnormalities" in the hips, "normal x-ray examination of the pelvis," "the glenohumeral joint appears normal" in the left shoulder, "no evidence of fracture, soft tissue calcification, or bony abnormality" in either the right or left knee, and "normal x-ray examination" of both the right and left knees. (AR 1792.)

The ALJ ultimately accepted and found in favor of Dr. Levine's testimony as a vocational expert, first as to Dr. Levine's determination that Plaintiff "actually performed

her past work at the heavy/ very heavy exertional level" and second as to Dr. Levine's opinion, based on Plaintiff's RFC finding, that Plaintiff was "unable to perform any of her past relevant work, either as actually done or as generally done in the national economy." (AR 32.) Concurrently, however, the ALJ's acceptance of Dr. Levine's two central findings does not require the ALJ to extrapolate from Dr. Levine's opinion and conclude Plaintiff was totally disabled and unable to participate in any capacity in the national economy. To do so would subvert the very regulations to which the ALJ is bound, namely to make independent decisions on the matter of a claimant's disability status.

Based on the totality of the record, the ALJ's own determinations that Plaintiff (1) was able to perform light work consisting of, in part, carrying up to 20 pounds at a time and (2) could no longer work as a caregiver due to her physical condition align with Dr. Levine's findings about Plaintiff's functional limitations. Thus, the ALJ accounted for Dr. Levine's vocational statement in, appropriately, making an independent and objective decision regarding Plaintiff's disability status. For these reasons, the Court finds the ALJ appropriately treated Dr. Levine's vocational statement in the context of issuing his September 5, 2018 Notice of Decision.

**b. The ALJ Properly Assessed Plaintiff's Residual Functional Capacity**

In supplementing her argument regarding the ALJ's failure to properly evaluate medical opinion evidence, Plaintiff maintains the ALJ neglected to consider Plaintiff's "moderate difficulties in concentration, persistence, or pace" in issuing his RFC finding. (Doc. No. 18., 22:10-13.) Plaintiff contends that, despite acknowledging her "poor concentration at some [medical] visits, and, due to her depression, anxiety and chronic pain," the ALJ "included no limitations regarding concentration, persistence, or pace in the RFC, but only limited [Plaintiff] to simple or mildly detailed work." (*Id.*, 22:13-21.) For this reason, Plaintiff posits the ALJ fell short of providing the "more detailed assessment" the RFC inquiry calls. The Court disagrees. In looking to the ALJ's Notice of Decision, there is ample detail to demonstrate the ALJ examined and accounted for evidence bearing on Plaintiff's ability to concentrate, maintain stamina, and pace herself in mental tasks,

19-CV-1760-GPC-WVG

amongst other categories of assessment, that commonly arise in the workplace.

At all times, "it is the responsibility of the ALJ ... to determine residual functional capacity." *Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001). Consequently, the ALJ is considered the final arbiter in resolving ambiguities in the medical evidence; thus, his conclusions are subject to substantial deference. *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008); *Batson v. Comm'r*, 359 F.3d 1190, 1193 (9th Cir. 2004). Notably, "the Commissioner's findings are upheld if supported by inferences reasonably drawn from the record." *Id*. Here, the ALJ's Notice of Decision is readily supported by inferences that are reasonably drawn from the record as it pertains to Plaintiff's mental faculties and range.

The ALJ notes Plaintiff had a "mild limitation" in "understanding, remembering, or applying information," Dr. Romero's progress notes "show[ed] [Plaintiff] is able to attend to and follow commands normally and with intact memory," Dr. Chavez's examinations also demonstrated Plaintiff "has been mostly cognitively intact since he began treating [Plaintiff] in 2011, except for some visits in which he noted poor memory," and that Dr. Chavez's report was consistent with Dr. Nicholson's medical opinion. (AR 26.)

The ALJ continued in noting that, although Plaintiff had a "moderate limitation" in concentrating, persisting, or maintaining pace, Dr. Romero's progress notes "show[ed] that [Plaintiff] has no difficulty focusing on a subject" and that Dr. Chavez determined Plaintiff "has been mostly cognitively intact since he began treating [her] in 2011, except for some visits in which he noted poor concentration." (AR 26.) Further, despite observing that Dr. Nicholson opined Plaintiff only had a "mild limitation" in this area, the ALJ "ha[d] given [Plaintiff] the benefit of the doubt and found a moderate limitation [was] indicated when considering the combined effects of her depression, anxiety, and chronic pain." (*Id*.)

Additionally, regarding Plaintiff's ability to adapt and manage herself, the ALJ found Plaintiff "had experienced a moderate limitation, including of one in-patient psychiatric hospitalization in July 2014. (AR 27.) Concurrently, the ALJ noted Plaintiff's mental health records indicated that she had "stabilized with treatment, [and] there [was] no evidence of suicidal ideation, suicidal attempts, panic attacks, agoraphobia, or other

19-CV-1760-GPC-WVG

exacerbations." (*Id*.) The ALJ also accounted for Plaintiff's admissions regarding her ability to travel multiple times to Mexico per year and travel internationally to the Philippines and stay there for a period of three months. (*Id*.)

Taken together, the ALJ's assessments of Plaintiff's mental health and, specifically, her ability to concentrate, persist, and maintain pace were sufficiently detailed and supported by the record. Further, the ALJ exercised his discretion to Plaintiff's benefit in finding a "moderate limitation" in Plaintiff's ability to concentrate, persist, and maintain pace and, from there, determining that Plaintiff could still perform simple or mildly detailed worked. (AR 26-27, 30-31.) *Lee v. Berryhill*, 721 F. App'x 604, 608 (9th Cir. 2017) (that plaintiff experienced moderate mental limitations reasonably supported the ALJ's RFC finding that plaintiff could still perform simple tasks); *Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1174-1176 (9th Cir. 2008) (same, and noting no impropriety in ALJ's decision that plaintiff could perform simple, repetitive tasks in light of his moderate difficulties concentrating, persisting, and maintaining pace and the medical record in evidence). The ALJ made these determinations in spite of Dr. Nicholson's medical opinion that Plaintiff was only mildly limited in such mental functions. Thus, the ALJ appropriately considered the evidentiary record and, where warranted, gave Plaintiff the benefit of the doubt in determining she "did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments on 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526)." (AR 26.)

## V.   CONCLUSION

For the foregoing reasons, the Court recommends that Plaintiff's summary judgment motion be DENIED and Defendant's cross-summary judgment motion be GRANTED. This Report and Recommendation is hereby submitted to the United States District Judge Gonzalo P. Curiel, pursuant to 28 U.S.C section 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure.

/ / /

/ / /

Finally, it is ORDERED that, **no later than Thursday, February 11, 2021**, any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation." No reply briefs in response to the Objections will be accepted.

**IT IS SO ORDERED.**

Dated: February 3, 2021

Hon. William V. Gallo
United States Magistrate Judge

19-CV-1760-GPC-WVG